UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

DAWN L. THOMAS-BRYANT,                          :

                         Plaintiff,          :

         - against -                              :

COMMISSIONER OF SOCIAL SECURITY,   :

                  Defendant.          :

-----------------------------------------------------------x

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED:   8/26/11 |

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
PAUL G. GARDEPHE**

09 Civ. 7232 (PGG) (FM)

**FRANK MAAS**, United States Magistrate Judge.

        Pro se plaintiff Dawn L. Thomas-Bryant ("Thomas-Bryant") brings this

action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g),

seeking review of a final decision of the Commissioner ("Commissioner") of the Social

Security Administration ("SSA") denying her applications for disability insurance

benefits and supplemental security income ("SSI"). The Commissioner concedes that the

Administrative Law Judge ("ALJ") who denied Thomas-Bryant's applications failed to

consider certain opinions of the consultative psychologist who examined Thomas-Bryant

in 2007. Accordingly, the Commissioner has moved for an order remanding the case for

further proceedings pursuant to the fourth sentence of Section 205(g). That motion is

unopposed. For the reasons set forth below, I recommend that the motion be granted.

I.      Background

        A.      Procedural History

                On June 15 and July 17, 2006, Thomas-Bryant filed applications for a

period of disability, disability insurance benefits, and SSI under Titles II and XVI of the

Act.[1]  (Tr. 23-24, 40-42).[2]  Thomas-Bryant claimed that she was disabled, as of

November 15, 2001, because of back and leg problems, arthritis, hypertension, and

complications from hernia surgery and a myomectomy.[3]  (See id. at 48).  After the SSA

denied both applications based on a state agency review, she requested a de novo hearing

before an ALJ.  (Id. at 23-24, 39-39A, 55-65).

                On May 6, 2008, ALJ Brian Lemoine held a hearing, at which Thomas-

Bryant was represented by Paul J. Fernandez, Esq.  (Id. at 12).  Both Thomas-Bryant and

a vocational expert, Victor Alberigi ("Alberigi"), testified at the hearing.  (Id.).

Thereafter, on May 20, 2008, ALJ Lemoine issued a written decision in which he

concluded that Thomas-Bryant was not disabled within the meaning of the Act.  (Id. at

12-20).  This decision became final on July 13, 2009, when the Appeals Council denied

Thomas-Bryant's request for review.  (Id. at 3-5).

---

        [1]     Although the record indicates that Thomas-Bryant applied for SSI, (see Tr. 23
(identifying Title XVI as the type of claim)), only a copy of her application for a period of
disability and disability insurance benefits is included in the record.  (Id. at 1, 40-42).

        [2]     Citations to "Tr." refer to the certified copy of the administrative record filed with
the Commissioner's answer to Thomas-Bryant's initial complaint.  (ECF No. 7).

        [3]     A myomectomy is the surgical removal of a myoma, which is "a benign tumor
made up of muscular elements."  Dorland's Illustrated Med. Dictionary 1242 (31st ed. 2007)
[hereinafter Dorland's].

Thomas-Bryant timely commenced this action on August 17, 2009.  (ECF No. 2).  On March 18, 2010, after the Commissioner had filed his answer, Thomas-Bryant filed an amended complaint.  (ECF Nos. 7, 8).  The Commissioner subsequently answered the amended complaint and, on May 28, 2010, moved to have the case remanded pursuant to the fourth sentence of Section 205(g) of the Act.  (ECF Nos. 9, 11).  Despite the Court's warning that the motion would be decided based solely on the Commissioner's moving papers should Thomas-Bryant fail to oppose the motion, (ECF No. 10), no opposition papers were filed.  On October 14, 2010, the matter was referred to me for a Report and Recommendation.  (ECF No. 13).

B.    Relevant Facts

1.    Non-Medical Evidence

Thomas-Bryant is forty-four years old.  (See Tr. 40).  She resides in Tuckahoe, New York, with her twelve-year-old son.  (See id. at 444, 455).  When she applied for benefits, Thomas-Bryant indicated that she was 5'9" tall and weighed 250 pounds.  (Id. at 47).  She is a single mother responsible for doing all of the cooking, cleaning, and other chores in her home.  (Id. at 56, 59, 190, 226, 443).  She also pays the bills and does the grocery shopping.  (Id. at 443-44).  Thomas-Bryant is married, although she and her husband are separated.  (Id. at 443).  In addition to $25 per week in alimony, Thomas-Bryant receives between $70 and $80 each month in food stamps, as well as a rent subsidy.  (Id. at 444, 447).  Her medical treatment is paid through Medicaid.  (See id.).  She does not, however, receive public assistance.  (Id.).

After graduating from high school, Thomas-Bryant earned an associate's degree in business administration.  (Id. at 224, 435).  Between 1985 and 1992, she worked as a sales clerk, newspaper delivery woman, and nurse's aide.  (Id. at 49).  She later spent approximately three years working as a temp, during which time she worked at Woolworth's and General Management Services, Inc.  (Id. at 49, 455-56).  At the latter job, she performed data entry.  (Id. at 455).  This data entry job lasted only "a couple months" because Thomas-Bryant became pregnant.  (Id. at 454).  Thereafter, she was employed as a security guard at an office complex from 1998 to 2001.  (Id. at 49, 448).  Although she initially worked full-time, she later limited herself to working only on weekends because she needed to watch her son during the week.  (Id. at 448).  She has not worked since November 15, 2001.[4]  (Id. at 40, 48).

       2.    <u>Medical Evidence</u>

          a.    <u>Back and Leg Pain</u>

In February 2002, Thomas-Bryant began receiving treatment from Marie Plawski, D.C., for severe pain in her lower back and right leg.  (See id. at 203, 206).  An x-ray of her lumbar spine taken on February 22, 2002, showed evidence of degenerative disc disease between her L4 and L5 vertebrae.  (Id. at 202).  The results of an MRI scan performed on May 3, 2002, revealed that Thomas-Bryant also had a herniated disc between her L5 and S1 vertebrae, with evidence of S1 root nerve impingement.  (Id. at

---

[4]      Thomas-Bryant indicated in her application for benefits that she left work due to a "mix up" on her job.  (Id. at 48) (block capitalization omitted).

201).  The MRI further showed a "[b]orderline degree" of stenosis, or narrowing, of her

spinal canal.  (Id.).  Thomas-Bryant was treated by Dr. Plawski two to three times per

week until the end of April 2002.  (Id. at 206-15).

Thomas-Bryant's medical records indicate that she complained sporadically

about back and leg pain to her primary care physician, Todd Friend, D.O., during visits

between December 2002 and February 2007.  (See id. at 87-90, 286-89, 417-19, 436).

Dr. Friend prescribed Relafen[5] and encouraged her to exercise regularly.  (Id. at 90, 289,

418).  After Dr. Friend referred her to a physical therapist during her July 2006 visit, she

completed five sessions of physical therapy.  (Id. at 84, 90, 295-304)  In a March 3, 2007

questionnaire regarding Thomas-Bryant's physical ability to perform work-related

activities, Dr. Friend opined that, over an eight-hour workday, Thomas-Bryant could

frequently lift or carry up to ten pounds and could stand or walk for at least two hours.

(Id. at 220).  He further noted that her back and leg pain did not limit her ability to sit, or

push and pull with her arms and legs.  (Id. at 221).  He was of the opinion that her

impairments would, however, preclude her from performing certain postural activities,

such as climbing stairs, crouching, crawling, and stooping.  (Id. at 221).

On November 30, 2006, David Guttman, M.D., conducted a consultative

physical examination of Thomas-Bryant.  (Id. at 190-93).  Dr. Guttman observed with

respect to Thomas-Bryant's back pain that her herniated disc served as a "mild restriction

---

[5]    Relafin is the brand name for a preparation of nabumetone, a nonsteroidal
antiinflammatory drug.  See Dorland's 1248, 1645.

to bending, lifting, squatting, and carrying." (Id. at 192).  Dr. Guttman also noted that Thomas-Bryant's gait was normal, and that she had no difficulty walking and getting on and off the examination table.  (Id. at 191).  His report further indicates that no motor or sensory deficits were observed.  (Id. at 192).

b.     Other Physical Impairments

In July 2003, Dr. Friend diagnosed Thomas-Bryant with hypertension.  (Id. at 183).  Her blood pressure at that time was 160/90.  (Id. at 181).  Dr. Friend prescribed Enalapril[6] and recommended that Thomas-Bryant avoid eating fried foods.  (Id. at 184).  In January 2004, Dr. Friend described Thomas-Bryant as being in category B in terms of her hypertensive risk, meaning that she had at least one risk factor (she was a "pack-a-day" smoker) but no target organ damage.  (Id. at 172, 174).  She also had no history of heart attacks or heart disease.  (Id. at 190).  As of June 2007, Thomas-Bryant's blood pressure was 136/86.  (Id. at 239).

In May 2007, Dr. Friend diagnosed Thomas-Bryant as having diabetes mellitus.  (Id. at 247).  Although Dr. Friend prescribed Glucotrol,[7] Thomas-Bryant apparently refused to take this medication.  (Id.).  In June 2007, Thomas-Bryant reported, however, that she felt "better overall" and had stopped eating sugary foods.  (Id. at 239).  She also stated that she was walking every day.  (Id.).

---

[6]      Enalapril is an antihypertensive drug.  Dorland's 619.

[7]      Glucotrol is the brand name for preparations of glipizide, a hypoglycemic drug used to treat type two diabetes mellitus.  Id. at 796, 801.

6

In her disability report, Thomas-Bryant indicated that she also suffered from arthritis.  (Id. at 47-48).  Dr. Guttman's examination report noted that Thomas-Bryant complained about arthritis in her hips, knees, neck, feet, and shoulders.  (Id. at 190).  Upon examining her, however, Dr. Guttman observed that her joints were "stable and nontender" and that there were no signs of "redness, heat, swelling, or effusion."  (Id. at 192).  His report further noted that she had full range of motion in her shoulders, elbows, forearms, wrists, hips, knees, and ankles.  (Id.).  Despite these findings, Dr. Guttman diagnosed Thomas-Bryant as suffering from arthralgia, or joint pain.[8]  (Id.).

Finally, Thomas-Bryant cited her hernia surgery and myomectomy in her disability report as causes of her disability.  (Id. at 48).  There is no evidence in the record, however, of any post-operative pain associated with these procedures.[9]

    c.    <u>Mental Condition</u>

    i.    <u>Dr. Friend</u>

During her appointments with Dr. Friend, Thomas-Bryant sometimes complained of stress and anxiety.  (Compare id. at 120-23, 144-51 (complaints of stress and anxiety) with id. at 89, 94, 98, 103, 110, 131, 135, 154, 158, 165, 173, 241, 246, 257, 280 (denying stress and anxiety)).  After a visit on June 15, 2005, Dr. Friend diagnosed

---

[8]    <u>Dorland's</u> 152.

[9]    In February 2007, Thomas-Bryant also underwent surgery for gallstone pancreatitis, (Tr. 265-84), which is the acute inflammation of the pancreas accompanied by the presence of gallstones.  <u>Dorland's</u> 1388.  The notes taken during Thomas-Bryant's first post-operative visit reflect that her post-operative course was "uneventful" and that she had "no complaints."  (Tr. 261).

Thomas-Bryant as having an unspecified anxiety disorder.[10]  (Id. at 122).  He prescribed

Zoloft[11] and asked her to return in four weeks.  (Id. at 123).  At her next visit, Thomas-

Bryant reported that the Zoloft initially had helped, but that she still felt stressed.  (Id. at

116).  Dr. Friend therefore increased her prescription to 100 milligrams per day.  (Id. at

119).  By September 2005, Thomas-Bryant had stopped taking Zoloft regularly.  (Id. at

108).

        In March 2008, Dr. Friend completed a questionnaire regarding Thomas-

Bryant's mental ability to perform work-related activities.  Noting that Thomas-Bryant

had "poor concentration" and was "unable to focus during conversations," Dr. Friend

opined that Thomas-Bryant had "marked" limitations in her abilities to (a) carry out

detailed instructions, (b) maintain attention and concentration for extended periods, (c)

work with or near others without being distracted by them, and (d) respond appropriately

to work pressures and changes in a routine work environment.[12]  He further concluded

that Thomas-Bryant's abilities to interact appropriately with the public, supervisors, and

co-workers, and to understand, remember, and carry out short, simple instructions, were

only moderately or mildly impaired.  (Id. at 423).

---

[10]     The notation "ICD-300.00" in the record indicates an "anxiety state not specified."  (See http://www.icd9data.com/2008/Volume1/290-319/300-316/300/300.00.htm) (last visited August 26, 2011).

[11]     Zoloft is the brand name for sertraline hydrochloride, a drug used to treat depressive, obsessive compulsive, and panic disorders.  Dorland's 1724, 2120.

[12]     A "marked" limitation in a given area was defined in the questionnaire as "a serious limitation" in which the "ability to function is severely limited but not precluded."  (Tr. 423).

ii.   <u>Dr. Minardo</u>

On September 17, 2007, Josephine Minardo, Psy. D., conducted a consultative "psychiatric" examination of Thomas-Bryant.  (<u>See</u> <u>id.</u> at 224-28).  Thomas-Bryant reported that she was experiencing symptoms of anxiety, specifically, "excessive worry and apprehension, feeling easily fatigued, being very irritable, restless, and having difficulty concentrating."  (<u>Id.</u> at 225).  She also stated that she had difficulty controlling her anger and impulsivity, and had a history of panic attacks.  (<u>Id.</u>).  Dr. Minardo opined that, as a result of Thomas-Bryant's anxiety and anger management issues, she did "not appear to be able to deal appropriate[ly] with stress."  (<u>Id.</u> at 227).  Dr. Minardo nevertheless concluded that Thomas-Bryant's stress-related problems did "not appear to be significant enough to interfere with [her] ability to function on a daily basis."  (<u>Id.</u>).  Indeed, Dr. Minardo noted that Thomas-Bryant was able to "dress, bathe, and groom herself," as well as "cook, clean, do laundry, shop, manage money, and take public transportation on her own."  (<u>Id.</u> at 226).  Dr. Minardo diagnosed Thomas-Bryant with mood and anxiety disorders, not otherwise specified, and recommended that she undergo psychological therapy and psychiatric intervention.  (<u>Id.</u> at 227).

Dr. Minardo's examination also addressed Thomas-Bryant's cognitive abilities.  Dr. Minardo observed that Thomas-Bryant experienced difficulty in both concentration and learning new material.  (<u>Id.</u> at 225).  Dr. Minardo nevertheless concluded that Thomas-Bryant's impairment in attention and concentration was only "mild."  (<u>Id.</u> at 226).  Dr. Minardo opined that Thomas-Bryant was capable of following

9

and understanding simple directions and instructions, and performing simple tasks independently.  (Id. at 227, 229).  Dr. Minardo further opined that Thomas-Bryant could maintain attention and concentration "in a limited fashion," and that she "may be able to maintain a regular schedule in a very structured environment."  (Id. at 227).

With respect to Thomas-Bryant's capacity to get along with others, Dr. Minardo found that, although she "appears to relate adequately with familiar others who[m] she has good relationships with," Thomas-Bryant appeared to have "difficulty controlling [her] anger and impulses."  (Id.).  Dr. Minardo therefore determined that Thomas-Bryant had "moderate" limitations in her ability to make judgments on simple work-related decisions and to interact appropriately with the public, supervisors, co-workers.  (Id. at 230).  She further concluded that Thomas-Bryant had "marked" limitations in her abilities to understand, remember, and carry out complex instructions, and make judgments in complex work-related decisions.  (Id. at 229).

3.    Hearing Testimony

At the hearing held before ALJ Lemoine on May 6, 2008, Thomas-Bryant testified that she was unable to work because of problems with her back, legs, feet, and sometimes her hands.  (Id. at 436).  She explained that she had difficulty lifting things, noting that she could lift a gallon of milk, "but not for long."  (Id. at 437).  She further testified that if she sat for more than thirty minutes, her legs and feet would become stiff.  (Id. at 437-38).  When asked whether she had any difficulty walking, Thomas-Bryant responded that she had "some" difficulty (and apparently wore orthotics), but that the

10

cause was not her back pain, but rather calluses on her feet.  (Id. at 438).  She also

testified that she received physical therapy for her back only when "it spaz[zed] out,"

which had last occurred approximately six months before the hearing.  (Id. at 442).

   With respect to psychological issues, Thomas-Bryant testified that she had

not seen a psychiatrist, although she previously had made efforts to do so.  (Id. at 439).

She also remarked that while she still was being prescribed Zoloft, she took it only as

needed.  (Id. at 446).  She further explained that she had problems concentrating, noting,

as an example, that she would not do something that she had planned to do on a particular

day if she "got to worrying or . . . didn't leave out the house in time."  (Id. at 440).  On

the other hand, she conceded that she was able to follow a schedule and could be at a

specific location at a specific time if needed.  (Id. at 441).  She further stated that she did

not deal well with stress or pressure, and had difficulty interacting with people with

whom she was not familiar.  (Id. at 440-41).  When asked whether she would find it

difficult to deal with co-workers and supervisors on a daily basis, she answered "yes,"

adding that other people "have a problem with [her]."  (Id. at 446).

   ALJ Lemoine also questioned Thomas-Bryant about her past work

experience.  Thomas-Bryant testified that when she worked as a security guard, she had to

patrol the office complex on foot.  (Id. at 449).  The only other jobs that Thomas-Bryant

could remember having held were her positions doing data entry in or around 1997 and at

Woolworth's in or around 1996 or 1997.  (Id. at 451).

The only other witness at the hearing was Alberigi, who testified as a

vocational expert.  ALJ Lemoine asked Alberigi to classify Thomas-Bryant's past work

as a security guard and data entry clerk in terms of exertional and skill level.[13]  (Id. at

454).  Alberigi classified Thomas-Bryant's work as a security guard as "light [work] with

an SVP of three."[14]  (Id. at 454).  He further described Thomas-Bryant's data entry job as

"sedentary [work] with an SVP of four."[15]

ALJ Lemoine then asked Alberigi if a hypothetical person of Thomas-

Bryant's age, education, and work history, who was "limited to a range of light exertional

work with no more than occasional postural positions and further mentally limited to the

---

[13]      "Exertional level" refers to the amount of strength required for a given job.  A
job's exertional level falls into one of five categories:  sedentary, light, medium, heavy, and very
heavy.  See U.S. Dep't of Labor, Dictionary of Occupational Titles, Appendix C, 1991 WL
688702 [hereinafter DOT]; 20 C.F.R. § 404.1567.  The Social Security regulations also
categorize occupations by the amount of skill needed for the job.  A given job thus is classified
as unskilled, semi-skilled, or skilled.  20 C.F.R. § 404.1568.  These skill levels, in turn,
correspond to specific vocational preparation, or SVP, levels outlined in the DOT.  SVP is
defined as "the amount of lapsed time required by a typical worker to learn the techniques,
acquire the information, and develop the facility needed for average performance in a specific
job-worker situation."  DOT, Appendix C, 1991 WL 688702.  "[U]nskilled work corresponds to
an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to
an SVP of 5-9."  SSR 00-4p, 2000 WL 1898704, at *3.

[14]      "Light work involves lifting no more than 20 pounds at a time with frequent
lifting or carrying of objects weighing up to 10 pounds . . . [and] requires a good deal of walking
or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg
controls."  20 C.F.R. § 404.1567(b).  An SVP level of three equates to "[o]ver 1 month up to and
including 3 months."  DOT, Appendix C, 1991 WL 688702.

[15]      "Sedentary work involves lifting no more than 10 pounds at a time and
occasionally lifting or carrying small articles like docket files, ledgers, and small tools.
Although a sedentary job is defined as one which involves sitting . . . [j]obs [also] are sedentary
if walking and standing are required occasionally."  20 C.F.R. § 404.1567(a).  An SVP of four
means "[o]ver 3 months up to and including 6 months."  DOT, Appendix C, 1991 WL 688702.

performance of simple, routine tasks" could perform her past work.  Alberigi answered

no, explaining that the security guard and data entry jobs had SVP levels of three and

four, respectively, and were thus "beyond simple work."  Alberigi nevertheless offered

three examples of jobs that such a hypothetical person would be able to perform:  (a)

small product assembler, (b) charge account clerk, and (c) labeler.[16]  (Id. at 458-60).

When ALJ Lemoine altered the limitations of the hypothetical person, such

that she could perform only mentally simple and physically sedentary work and be able

"to lift or carry more than ten pounds or stand and walk more than two hours," Alberigi

opined that the person still would be able to work as a charge account clerk, an order

clerk in the food and beverage industry, or a surveillance system monitor.  (Id. at 460-61).

Alberigi also testified that those jobs were available in substantial numbers in the regional

and national economies.  (Id. at 459, 461).

C.    ALJ Decision

On May 20, 2008, ALJ Lemoine issued a written decision, in which he

concluded that Thomas-Bryant was not disabled within the meaning of the Act as of

March 31, 2008, her date last insured.  (Id. at 9-20).  In doing so, ALJ Lemoine applied

the five-step sequential analysis required by 20 C.F.R. § 416.920.  (Id. at 13-20).

---

[16]     A labeler, also called a marker or stamper, "[m]arks or affixes trademarks or other
identifying information, such as size, color, grade, or process code, on merchandise, material, or
product, using one or more methods, such as metal punch and hammer, crayon, rubber stamp and
ink, electric pencil, branding iron, acid and stencil, sand-grit and stencil, or tags."  DOT
§ 920.687-126, 1991 WL 687992.

At Step One, ALJ Lemoine found that Thomas-Bryant had "not engaged in substantial gainful activity since November 15, 2001, the alleged onset date."  At Step Two, he concluded that she suffered from four severe impairments:  (i) degenerative disc disease of the lumbar spine with disc herniation at L5-S1; (ii) hypertension; (iii) diabetes mellitus; and (iv) a mood, or "affective," disorder.[17]  (Id. at 14-15).

At Step Three, the ALJ determined that none of these severe impairments met or medically equaled one of the impairments listed in Appendix 1 of the SSA regulations.  (Id. at 15-16).  With respect to Thomas-Bryant's lower back pain, the ALJ appeared to apply the criteria set forth in Section 1.04 of the Appendix 1 Listings, which address degenerative disc disease.[18]  (Id. at 15); see also Appendix 1 § 1.04.  He concluded that Thomas-Bryant's lower back pain was not "disabling" within the meaning of this Listing because it "requires specific anatomical deformities and/or neurological

---

[17]     Although Dr. Guttman diagnosed Thomas-Bryant with arthralgia, (Tr. 192), the ALJ did not determine that Thomas-Bryant's joint pain rose to the level of a "severe impairment."  Even assuming that this determination was in error, it is clear that Thomas-Bryant's arthralgia would not meet or medically equal the relevant Listing since she had full range of motion in her major joints and no difficulties walking.  (Id.); see 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1") § 1.02 ("Major dysfunction of a joint(s)").

[18]     ALJ Lemoine's statements that he considered Thomas-Bryant's "lower back pain under the criteria set forth in section 1.00 et seq. "Musculoskeletal Impairments," and that this Listing "requires specific anatomical deformities and/or neurological findings resulting in an inability to ambulate effectively on a sustained basis," create some ambiguity as to which subsection of that Listing he applied.  (Tr. 15).  In any event, even if the ALJ applied the incorrect legal standard, his error would only weigh in favor of remanding the case for further proceedings.  See Rosa v. Callahan, 168 F.3d 72, 83 (2d Cir. 1999) ("Where . . . the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the Commissioner for further development of the evidence.") (brackets and internal quotation marks omitted).

14

findings resulting in an inability to ambulate effectively on a sustained basis," while the medical evidence in the record indicated to the contrary that Thomas-Bryant had a normal gait, full range of motion in all of her major joints with no evidence of swelling, effusion or instability, and the ability to walk unassisted.  (Tr. 15).  Additionally, ALJ Lemoine observed that there was no evidence of muscle atrophy or motor or sensory deficits.  (Id.).

Turning to Thomas-Bryant's hypertension and diabetes mellitus, ALJ Lemoine evaluated these impairments under the Listings pertaining to the cardiovascular and endocrine systems, respectively.  See Appendix 1 §§ 4.00, 9.00.[19]  He noted that both conditions were "overall controlled with medication," and that Thomas-Bryant had "no history of coronary artery disease" and "no target organ damage."  (Tr. 15).  Accordingly, he determined that these ailments did not rise to the level of the impairments described in the Listings.

Finally, ALJ Lemoine evaluated Thomas-Bryant's affective disorder under Section 12.04 of the "Mental Disorders" Listing.[20]  See Appendix 1 § 12.04.  He observed that a finding of disability under this section requires a showing of "marked restriction in at least two of the following areas:  activities of daily living, social functioning and concentration of persistence and pace, as well as repeated episodes of decompensation, each of extended duration."  (Tr. 15).  The ALJ rejected Thomas-Bryant's counsel's

---

[19]     Although ALJ Lemoine referred to section 3.00 as the Listing discussing cardiovascular impairments, (Tr. 15), the correct section is 4.00.

[20]     ALJ Lemoine did not specifically refer to Section 12.04 in his decision.  It is clear in context, however, that he was applying this section.  (See Tr. 15-16).

argument that Dr. Friend had opined that she suffered from marked restrictions in social

interaction and concentration.  (Id.).  The ALJ instead adopted Dr. Minardo's opinions

that Thomas-Bryant could perform simple tasks, even though she "would have difficulty

getting along with others, maintaining attention and concentration and making

appropriate decisions," and that her "psychiatric symptoms were not significant enough to

interfere with her daily functioning."  (Id. at 15-16).  He therefore concluded that

Thomas-Bryant suffered only "moderate difficulties" in maintaining social functioning,

concentration, persistence or pace.  (Id. at 16).  This conclusion, coupled with the ALJ's

findings that the record was devoid of evidence of decompensation, resulted in his

determination that Thomas-Bryant failed to meet or medically equal the impairments

described in Section 12.04.  (Id.).

      In reaching these conclusions, ALJ Lemoine did not discuss Dr. Minardo's

opinions that Thomas-Bryant "may be able to follow a schedule in a very structured

environment," and that Thomas-Bryant did "not appear to be able to deal appropriate[ly]

with stress."  (See id. at 227).

      ALJ Lemoine then proceeded to Step Four of the analysis, which required

him to assess Thomas-Bryant's residual functional capacity ("RFC").  (Id. at 16-19).

After considering all of Thomas-Bryant's symptoms, as well as the opinion evidence in

the record, the ALJ found that Thomas-Bryant physically was able to perform "sedentary

work."  (Id. at 16, 18).  As the ALJ explained, "sedentary" work "is performed mostly

sitting and does not involve lifting/carrying objects weighing more than 10 pounds."  (Id.

at 18).  The ALJ acknowledged, however, that Thomas-Bryant lacked the physical

capacity to perform work that would require her to climb, crawl, crouch, or stoop, or to

balance or kneel more than occasionally.  (Id. at 16).

       ALJ Lemoine determined with respect to Thomas-Bryant's mental capacity

that she could perform "simple, routine tasks" and, therefore, "most unskilled jobs in the

economy."  (Id. at 18).  In making this determination, the ALJ noted that he did not find

Dr. Friend's opinion that Thomas-Bryant had moderate to marked limitations in mental

functioning persuasive because "Dr. Friend is a general practitioner, not a mental health

specialist," and, moreover, his own treatment notes, particularly his observation that

Thomas-Bryant had only "mild limitations in [her] ability to carry out short, simple

instructions," belied that assessment.  (Id.).  The ALJ nevertheless concluded that

Thomas-Bryant was unable to perform her past work as a security guard and data entry

clerk because both jobs are considered semi-skilled work.  (Id. at 18-19).  Again, the ALJ

made no mention of Dr. Minardo's opinions regarding Thomas-Bryant's ability to cope

with stress or follow a schedule in a structured environment.

       In arriving at his RFC determination, ALJ Lemoine also noted that he did

not find Thomas-Bryant's testimony regarding her physical and mental condition "totally

credible."  The facts that he believed weighed against her claim of disability were that (a)

she had received only "conservative treatment" for her lower back pain, such as

chiropractic manipulation and physical therapy; (b) she had a "poor work history prior to

her alleged onset date," which indicated that she lacked the motivation, rather than the

capacity, to work; (c) she did not appear to be in obvious physical pain at the hearing; (d) her conduct at the hearing did not demonstrate any "obvious evidence of any significantly limiting mental or emotional problem;" and (e) there was ample evidence that she "lives independently and is self-sufficient in all needs for herself and her son." (Id. at 17).

Turning to the fifth step of the analysis, ALJ Lemoine considered whether there were jobs in sufficient numbers in the national economy that Thomas-Bryant could perform "consistent with [her RFC], age, education and work experience." (Id. at 19-20). To fulfill his burden at this step, ALJ Lemoine relied on both the Medical-Vocational Guidelines of Appendix 2, Subpart P, Part 404, commonly known as the "Grids," see Calzada v. Asture, No. 09 Civ. 3926 (RJS) (MHD), 2010 WL 4683570, at *14 (S.D.N.Y. Nov. 17, 2010), and Alberigi's testimony as a vocational expert. The ALJ began his analysis by finding that Thomas-Bryant, who was thirty-five years old on the alleged disability onset date, was a "younger individual" under the Social Security regulations. (Id. at 19). He also found that she had a high school education and experience performing semi-skilled work. (Id. at 19-20). In light of these findings, Rule 201.28 of the Grids directed the conclusion that Thomas-Bryant was "not disabled." (Id. at 20).

ALJ Lemoine recognized, however, that he could not rely on the Grids as the exclusive framework for determining whether Thomas-Bryant was disabled because her "ability to perform all or substantially all of the requirements of [sedentary] work has been impeded by additional limitations." Accordingly, he deferred to Alberigi's

testimony that a person with Thomas-Bryant's physical and mental capacity had the ability to work as a charge account clerk, order clerk, and surveillance systems monitor, and that such jobs were available in both the local and national economies. ALJ Lemoine thus concluded that Thomas-Bryant was not disabled. (Id. at 19-20).

## II.   Applicable Law

### A.   Remand

Social Security regulations require the SSA to "evaluate every medical opinion" it receives, "[r]egardless of its source." 20 C.F.R. §§ 404.1527(d), 416.927(d); see also id. §§ 404.1527(a)(2), 416.927(a)(2) (defining "medical opinions" as "statements from physicians and psychologists . . . that reflect judgments about the nature and severity of [a claimant's] impairment(s)"). Thus, "[f]ailure to consider even a single medical opinion — irrespective of the substantial weight of controverting evidence . . . — constitutes reversible error." Canton v. Astrue, No. 08 Civ. 3038 (NGG) (JO), 2010 WL 5391184, at *4 (E.D.N.Y. Dec. 22, 2010).

When an ALJ fails to consider a medical opinion, remanding the case to the Commissioner for further proceedings is usually the appropriate course of action. See Rosa, 168 F.3d at 82-83 ("Where there are gaps in the administrative record . . . , we have, on numerous occasions, remanded to the Commissioner for further development of the evidence.") (internal quotation marks and brackets omitted). The Act, however, gives district courts the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social

Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g)

(emphasis added). Accordingly, where "the record provides persuasive proof of disability

and a remand for further evidentiary proceedings would serve no purpose," the court

should simply reverse the Commissioner's decision and remand the case for the sole

purpose of calculating the amount of benefits due. Parker v. Harris, 626 F.2d 225, 235

(2d Cir. 1980); see also Rosa, 168 F.3d at 83 (remand for a calculation of benefits is

proper only if there is "no apparent basis to conclude that a more complete record might

support the Commissioner's decision").

     B.     Disability Determination

          The term "disability" is defined in the Act as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A). In

determining whether a claimant is disabled, the Commissioner is required to apply the

five-step sequential process set forth in 20 C.F.R. §§ 404.1520, 416.920. The Second

Circuit has described that familiar process as follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity. If he is not,
> the [Commissioner] next considers whether the claimant has a
> "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities. If the claimant
> suffers such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an
> impairment which is listed in Appendix 1 of the regulations.
> If the claimant has such an impairment, the [Commissioner]

> will consider him disabled without considering vocational
> factors such as age, education, and work experience . . . .
> Assuming the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's severe
> impairment, he has the [RFC] to perform his past work.
> Finally, if the claimant is unable to perform his past work, the
> [Commissioner] then determines whether there is other work
> which the claimant could perform.

Rosa, 168 F.3d at 77 (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982));

accord Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).

The claimant bears the burden of proof with respect to the first four steps of

the process.  DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998).  If the

Commissioner finds that a claimant is disabled (or not disabled) at an early step in the

process, he is not required to proceed with any further analysis.  See 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4); Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999).

However, if the analysis reaches the fifth step of the process, the burden shifts to the

Commissioner to show that the claimant is capable of performing other work.

DeCherico, 134 F.3d at 1180.

In assessing whether a claimant has a disability, the factors to be considered

include:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on

such facts; (3) subjective evidence of pain or disability testified to by the claimant or

other[s]; and (4) the claimant's educational background, age, and work experience."

Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980) (internal citations omitted).

III.     Application of Law to Facts

        The Commissioner concedes that ALJ Lemoine did not consider Dr. Minardo's opinions that Thomas-Bryant "may be able to maintain a regular schedule in a very structured environment" and that she does "not appear to be able to deal appropriate[ly] with stress."  (ECF No. 12 at 12).  A remand to the Commissioner therefore is appropriate.  See Canton, 2010 WL 5391184, at *4.  The only remaining issue for the Court to determine is whether the record contains such "persuasive proof of disability" that any further proceedings before the Commissioner upon remand are unnecessary.  Parker, 626 F.2d at 235.  In this case, the record contains no such "persuasive proof."

    A.     Physical Impairments

        There is substantial evidence that Thomas-Bryant's physical impairments did not render her disabled.  At the outset, it is clear that Thomas-Bryant's back pain did not meet or medically equal Section 1.04 of the Listings, which requires a showing of (a) "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss," (b) spinal arachnoiditis,[21] or (c) lumbar spinal stenosis . . . resulting in inability to ambulate effectively."  Appendix 1 § 1.04.  Indeed, "no motor or sensory deficit" was noted by Dr. Guttman during his examination, nor was there any evidence of atrophy.  (Tr. 192).  Furthermore, there is no mention of spinal arachnoiditis

---

[21]     Spinal arachnoiditis is an inflammation of the membrane covering the spinal cord. Dorland's 124.

in the record, which, by contrast, is replete with evidence of Thomas-Bryant's ability to walk without assistance.  (See id. at 61, 238).

As for Thomas-Bryant's hypertension, ALJ Lemoine correctly determined that this impairment was controlled by medication, and it is clear that this condition did not curtail her abilities to perform the activities of daily life.  (See id. 56, 59, 190, 226, 443-44).  Accordingly, the ALJ properly declined to consider it a sufficiently severe impairment.  See Mejia v. Astrue, 719 F. Supp. 2d 328, 341 (S.D.N.Y. 2010) (hypertension does not satisfy Section 4.00(h)(1) if it is controlled by medication and does not affect claimant's ability to perform "a variety of non-strenuous activities") (collecting cases).  It is equally clear that Thomas-Bryant's diabetes mellitus does not even approach the level of severity required by Section 9.08 of the Listings.  See Appendix 1 § 9.08 (claimant alleging disability due to diabetes mellitus must demonstrate existence of (a) neuropathy,[22] (b) acidosis,[23] or (c) retinitis proliferans).[24]

Furthermore, in determining Thomas-Bryant's RFC, ALJ Lemoine gave controlling weight to the opinion of Dr. Friend, Thomas-Bryant's treating physician, that Thomas-Bryant was capable of performing sedentary work.  (Tr. 18, 220-23).  The ALJ's

---

[22]     Neuropathy is a "functional disturbance or pathological change in the peripheral nervous system."  Dorland's 1287.

[23]     Acidosis is "the accumulation of acid and hydrogen ions or depletion of the alkaline reserve (bicarbonite content) in the blood and body tissues, resulting in a decrease in pH."  Id. at 17.

[24]     Retinitis proliferans is a condition involving the formation of new blood vessels and fibrous tissue bands extending from the surface of the retina.  Id. at 1259, 1658.

reliance on Dr. Friend's opinion was particularly favorable to Thomas-Bryant in light of Dr. Guttman's opinion that Thomas-Bryant's back pain was only a "mild restriction to bending, lifting, squatting, and carrying."  (Id. at 192).

Finally, it was proper for ALJ Lemoine to rely on Alberigi's testimony, rather than the Grids, to determine that there were jobs in the regional and national economies that Thomas-Bryant would be physically capable of performing.  Indeed, relying on the Grids alone would have amounted to error.  See Akey v. Astrue, 08 Civ. 1084, 2011 WL 1298808, at *6 (N.D.N.Y. Mar. 31, 2011) ("[U]se of the grids as the exclusive framework for making a disability determination may be precluded where, as here, plaintiff's physical limitations are combined with non-exertional impairments[25] which further limit the range of work he can perform.  In these circumstances, the Commissioner must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.") (internal citations and quotation marks omitted).  The record therefore lacks "persuasive proof" that any of Thomas-Bryant's physical impairments rose to the level of a "disability."

---

[25]     Nonexertional limitations include, inter alia, "difficulty maintaining attention or concentrating; . . . difficulty understanding or remembering detailed instructions; . . . or . . . difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching."  20 C.F.R. § 404.1569a.

24

B.    Mental Impairment

There also is no "persuasive proof" in the record that Thomas-Bryant's affective disorder rendered her disabled, even though Dr. Minardo opined that Thomas-Bryant did "not appear to be able to deal appropriate[ly] with stress." (Tr. 227). First, there is substantial evidence to support a finding that Thomas-Bryant's affective disorder did not meet or medically equal the impairments described in Section 12.04. Although the ALJ noted that Thomas-Bryant's attorney, Mr. Fernandez, had argued at the hearing that Dr. Friend "had assessed marked limitations in social interaction and with concentration," (id. at 15), Dr. Friend, in fact, opined that Thomas-Bryant's ability to interact with the public, supervisors, and co-workers was only moderately, rather than markedly, impaired. (Id. at 424). Accordingly, Dr. Friend never concluded that Thomas-Bryant had at least two of the four "marked restrictions" specified in Section 12.04. See Appendix 1 § 12.04(B)(1)-(4).

In any event, even if Dr. Friend had found marked limitations in both social functioning and concentration, it is clear that Thomas-Bryant's affective disorder is not severe enough to satisfy the remaining requirements of Section 12.04. Under this Listing, a claimant must adduce evidence of "[m]edically documented persistence, either continuous or intermittent," of depressive, manic, or bipolar syndrome, in addition to at least two marked limitations, or, alternatively, a "[m]edically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration." Appendix 1 § 12.04(A)(1)-(3), (C). The record is devoid of any evidence establishing the

25

existence of persistent depressive, manic, or bipolar syndrome, or any psychotic

disorders.  Dr. Minardo's opinion that Thomas-Bryant appeared unable to deal with stress

does not change this result.

Although Dr. Minardo's opinion regarding Thomas-Bryant's ability to

handle stress does not provide "persuasive proof" of disability, that opinion still may be

relevant to Thomas-Bryant's capacity to perform the jobs that Alberigi identified as being

available in the regional and national economies.  Accordingly, remanding the case to the

ALJ with instructions to develop the evidence further is the proper course of action.  See

Berman v. Comm'r of Social Sec., 06 Civ. 1186 (FB), 2007 WL 2178073, at *2

(E.D.N.Y. July 25, 2007) (remanding case for further proceedings where ALJ failed to

consider medical opinions that did not establish that claimant was disabled, but, rather,

"establish[ed], at best, a slightly more restrictive RFC than that found by the ALJ").

IV.     Conclusion

For the foregoing reasons, the Commissioner's motion to remand this case

for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g), (ECF No.

11), should be granted.

V.      Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule

72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered

to the chambers of the Honorable Paul G. Gardephe and to the chambers of the

undersigned at the United States Courthouse, 500 Pearl Street, New York, New York

10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72(b). Any requests for an extension of time for filing objections must be directed to

Judge Gardephe. The failure to file these timely objections will result in a waiver of

those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a),

6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Dated:     New York, New York
           August 25, 2011

                                          FRANK MAAS
                                   United States Magistrate Judge

Copies to:

Dawn L. Thomas-Bryant
P.O. Box 535
White Plains, NY 10603

Leslie A. Ramirez-Fisher, Esq.
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007

27